Charles L. SINGLETON, Appellant,

v.

A.L. LOCKHART, Director, Arkansas Department of Correction, Appellee.

No. 90–2211.

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1991.

Decided May 1, 1992.

Rehearing and Rehearing En Banc Denied July 2, 1992.

Jeffrey M. Rosenzweig, Little Rock, Ark., argued, for appellant.

Clint Eugene Miller, Little Rock, Ark., argued, for appellee.

Before WOLLMAN, Circuit Judge, ROSS and HENLEY, Senior Circuit Judges.

WOLLMAN, Circuit Judge.

Charles Laverne Singleton appeals from the district court's [1] order dismissing his petition for habeas corpus relief under 28 U.S.C. § 2254.[2] We affirm.

## I.

On October 30, 1979, an Arkansas jury convicted Singleton of capital murder for the June 1, 1979, killing of Mary Lou York, the owner/operator of a grocery store in Hamburg, Arkansas. After stabbing Mrs. York twice in the neck, Singleton absconded with an undetermined amount of money. The jury sentenced Singleton to death by electrocution.

After exhausting his state remedies, Singleton filed a petition for federal habeas corpus relief. The district court upheld the conviction, but set aside the death sentence. *Singleton v. Lockhart*, 653 F.Supp. 1114 (E.D.Ark.1986). In *Singleton v. Lockhart (Singleton I)*, 871 F.2d 1395 (8th Cir.1989), we affirmed the district court's decision to uphold Singleton's conviction for capital murder. We reversed the district court's order vacating Singleton's death sentence, however, and remanded the case to the district court for reinstatement of the sentence.[3]

On remand, Singleton challenged the reinstatement of the death sentence. The district court, however, rejected Singleton's challenge, dismissed his habeas petition, and dissolved the stay of execution.

On appeal, Singleton argues that (1) he received ineffective assistance of counsel during the penalty phase of his trial, and (2) that the Arkansas death penalty statute is unconstitutional.

## II.

Singleton argues that he received ineffective assistance of counsel because his defense counsel failed to introduce any mitigating evidence during the penalty phase of his trial, notwithstanding Singleton's insistence that he not offer such evidence. Singleton also challenges the district court's finding that he knowingly and intelligently waived his right to present such evidence.

Robert B. Wellenberger was appointed to represent Singleton on June 12, 1979. Wellenberger had been practicing law about three years at the time of the appointment, having been admitted to the bar in March of 1976. Prior to his appointment in this case, Wellenberger had defended several murder cases, including cases involving defendants and victims of different races, the situation in the present case (Singleton is black, Mrs. York was white). He had been successful in some of those murder cases.

Wellenberger testified that he had begun preparing for the penalty phase of Singleton's trial from the time of his first meeting with Singleton, which occurred on or about June 14, 1979. As a part of that preparation, he asked Singleton to prepare a personal history, including such things as the name of his minister. Wellenberger testified that Singleton prepared a very complete and thorough personal history, which Wellenberger believed would make an excellent basis for an argument during the penalty phase and which Wellenberger wanted to expand upon.

Wellenberger testified that Singleton consistently maintained the attitude through Wellenberger's representation of him that he would not accept a plea offer calling for a sentence of more than seven years in the penitentiary. Singleton was of the opinion that the state would be unable to convict him of the murder charge and that the state and the jury had no right to be so upset with him. Wellenberger told Singleton that in view of the fact that the state had two eyewitnesses, plus the victim's dying declarations to a police officer

**1.** The Honorable G. Thomas Eisele, Chief Judge, United States District Court for the Eastern District of Arkansas.

**2.** During the pendency of this appeal, Singleton filed a pro se motion to dismiss the appeal. We denied the motion by an order entered on Feb-

ruary 4, 1992, and denied Singleton's motion for reconsideration on February 26, 1992.

**3.** For a fuller discussion of the factual and procedural history of this case, see *Singleton I.*

and to a doctor that Singleton had stabbed her, the evidence was more than sufficient to support a conviction and that it was highly probable that the jury would convict him of capital murder.

Wellenberger explained to Singleton the role of the penalty phase of the trial. He explained to Singleton that the fact that there was evidence that Singleton had been under the influence of drugs and alcohol at the time of the killing would constitute a mitigating circumstance under Arkansas law. Wellenberger intended to establish this fact through the testimony of Gary Tippie, who had been with Singleton prior to the killing and who would have testified that Singleton had been smoking marijuana and drinking beer and whiskey prior to the murder.

Wellenberger explained to Singleton the aggravating and mitigating circumstances set forth in the Arkansas death penalty statutes. He · explained that Singleton could not rely on a lack of a significant prior criminal history as a mitigating circumstance. Singleton had been convicted of burglary at age fifteen, had served two years, eight months of his ten-year sentence, and was on parole at the time of the killing. (Wellenberger had some doubt whether the state would be able to rely upon this conviction in view of the fact that Singleton had waived appointment of counsel prior to entering his guilty plea to the burglary charge.)

Wellenberger explained that Singleton could rely upon his youthful age (Singleton was born on March 29, 1959, and thus had turned twenty only two months before the murder), the fact that he was under the influence of drugs and alcohol at the time of the killing, and upon the facts set forth in the personal history statement that Singleton had prepared at Wellenberger's request.

Wellenberger discussed the penalty phase with Singleton at length at least three times prior to the commencement of the trial. Throughout these discussions, Singleton maintained that if it came to a decision of whether he would spend the rest of his life in prison without parole or be sentenced to death by electrocution, he did not desire to put on any evidence. He told Wellenberger that he had been to prison and indicated that he did not want to spend the rest of his life in prison. Wellenberger explained to Singleton that that was not the way Wellenberger wanted to present the case. Singleton told Wellenberger that he would plead guilty in exchange for a prison term of not more than seven years. At one point prior to trial the deputy prosecuting attorney asked Wellenberger to find out whether Singleton would plead guilty in exchange for a sentence of life imprisonment without parole. The deputy prosecutor did not couch this inquiry in the terms of an offer and later called Wellenberger and said that he would be unable to accept such a plea. No further plea offers were made, and Wellenberger's several inquiries about the possibility of a negotiated plea were met with the response that a life sentence without parole was not a possibility and that the case would be tried. Contrary to Singleton's testimony, Wellenberger testified that there were never any discussions between himself and Singleton about a twenty-one year sentence because no such offer was ever made by the state.

In preparation for the penalty phase, Wellenberger discussed with Singleton the ministers at the churches that Singleton had attended earlier in his life (he had not attended church for a long time prior to the killing) as well as Singleton's school records (Singleton had dropped out of school and had had some problems while in school). Wellenberger visited with Mildred Howard, Singleton's mother, about Singleton's background and the matter of how Wellenberger intended to proceed if the · jury found Singleton guilty. Wellenberger found that Mrs. Howard could not bring herself to admit that her son was guilty, notwithstanding the fact that Wellenberger let her read Singleton's handwritten statement in which he acknowledged having stabbed the victim. Based upon his discussion with Mrs. Howard, Wellenberger concluded that she would not be an effective witness during the penalty phase. ·

In further preparation for the penalty phase, Wellenberger had a subpoena served on Gary Tippie; and Tippie was present and available to testify at the penalty phase.

Prior to trial, Wellenberger requested that Singleton be given a psychiatric examination. Accordingly, Singleton was sent to the Arkansas State Hospital, where he was administered a battery of tests and was examined by a psychologist and a psychiatrist. The results of the tests and the examination revealed that Singleton has a full scale IQ of 83, which places him within the dull normal range of intellectual functioning. He appeared to be reading at nearly a seventh grade level. There were no gross signs of organicity present, and his short term memory appeared to be adequate. The summary of the report prepared by the examining psychologist stated:

While Mr. Singleton was very uncooperative throughout the evaluation, he does not appear to be overtly psychotic or out of contact with reality at this time. Rather, he appears to be an impulsive, unpredictable, and somewhat hostile individual who is quite resentful at finding himself in his current situation. He certainly appears capable of understanding the charges against him and aiding his attorney with his defense and should be returned to the court for trial.

The examining psychiatrist's report concluded that:

It is the opinion of the examining psychiatrist that Charles Lavern Singleton is not mentally ill to the degree of legal irresponsibility at the time of this examination and probably was not at the time of the commission of the alleged offense. It is further the opinion of the examining psychiatrist that Mr. Singleton has the mental capacity to understand the proceedings aginst [sic] him and has the mental capacity to assist effectively in his own defense; and, that he was probably not suffering from mental disease or defect of such degree as to make him unable to appreciate the criminality of

his conduct or to conform his conduct to the requirments [sic] of the law.

The examining psychiatrist's report showed Singleton's diagnosis to be: "1) Without psychosis 2) Habitual Excessive Drinking 3) Antisocial Personality, Severe."

Although Singleton does not have a high school diploma, having dropped out of school in the ninth grade, he testified that he had done some work on a GED while imprisoned on the burglary conviction.

After the jury returned to the courtroom and had been polled with respect to its verdict finding Singleton guilty of aggravated robbery and capital felony murder, the following proceedings took place:

THE COURT: Very well. Are there any more questions, Mr. Wellenberger, as to the polling of the jury?

MR. WELLENBERGER: No, Your Honor.

THE COURT: Very well.

MR. WELLENBERGER: Your Honor, I would request a short recess before we proceed to the second stage of this trial.

MR. GIBSON: I object to a recess at this time, Your Honor. I think that the Court should proceed with the instructing of the jury. And then if the jury feels they need a recess, it's up to them. But I just don't think this is the time for a recess.

(Whereupon, an off the record discussion was had at the Bench out of the hearing of the jury and the Court Reporter and was not reported.)

THE COURT: I'm going to give the Defendant about five minutes recess.

MR. GIBSON: All right, Your Honor, but note my objection. I would request that even though the Court's in recess, it's only five minutes, that we stay where we are.

THE COURT: All right. Mr. Sheriff, take the Defendant and his attorney, go out there. We don't have to particularly be in recess.

Members of the jury, do you want a recess? If you do, if you'll let me know, we'll take a recess.

MR. WELLENBERGER: Your Honor, we are ready to proceed at this time.

THE COURT: Very well. Proceed, Mr. Gibson.

MR. GIBSON: Does the Court feel it should do the instructions at this time or are you asking the parties if they want to put in any additional evidence?

THE COURT: I think you should put on any additional—

MR. GIBSON: The State has no additional evidence, Your Honor.

MR. WELLENBERGER: The Defense has no additional evidence, Your Honor.

\* \* \* \* \* \*

THE COURT: Members of the jury, you have found Charles Lavern Singleton guilty of capital murder. After hearing arguments of counsel, you will again retire to deliberate and decide whether he is to be sentenced to death by electrocution or to life imprisonment without parole.

In determining which sentence shall be imposed, you may be required to make specific written findings as to the existence or absence of aggravating or mitigating circumstances. Appropriate forms will be provided for you and I'm going to instruct you on the procedures that you must follow.

The trial court then went on to instruct the jury regarding aggravating and mitigating circumstances.

After the trial judge completed reading the instructions to the jury, the prosecutor made a brief final argument. Following the state's final argument, Wellenberger addressed the jury as follows:

Ladies and gentlemen, it's been a long trial. You've sat and listened to the evidence and you've made your decision. I don't believe any one of you would like to take a man's life and I think you will do what's proper. I know you are people of conviction, and if it is required then that's what you'll do. If you don't think it's required, you will not. I know that none of you will make this decision lightly. I have absolutely nothing to say to you in regard to it. I do not envy you having to make the decision. And I trust that you would deliberate now and reach what you feel is proper in this case.

After the jury retired to deliberate on the penalty to be imposed, Wellenberger dictated the following statement to record:

At the conclusion of the guilt phase of the trial and after the jury had rendered its verdict, I asked the Court for a short recess so I could confer with my client concerning the evidence that he wanted introduced into the record concerning mitigating circumstances. I have available a witness that would testify as to the fact that he was under the influence of alcohol and drugs which is a mitigating circumstance. I advised him of this but he said he did not want to enter any evidence whatsoever concerning anything; that he wanted to allow them to just go on and do what they wanted to do. Over my objections and against my advice, he insisted that I maintain that position and that I say nothing further.

At the habeas hearing, Wellenberger testified:

I begged him to let me put Mr. Tippey [sic] on and to let me try to introduce his personal history that he had handwritten out for me. I told him I thought that I could get the judge to let that in without him taking the stand and that if not then I could call his mother, who I had previously arranged to let stay in the courtroom as an exception to the rule and to testify.

Wellenberger described what had happened during the short recess between the guilt and penalty phases of the trial:

We went into a private room adjacent to the courtroom, and I had always felt like that part of Charles' reluctance to let a penalty phase be presented was the fact that he refused to recognize the possibility that it would be necessary. At this time, I said, "It's here, and we have to make our decision. This will be the only chance you get to make it because we've got to go back in now and present it or not present it." I said, "Mr. Tippie is in the witness room. He's prepared to prove the drugs. We can argue your age." Mr. Singleton said, "I want you to say nothing."

This conversation was five to 10 minutes, and Mr. Singleton, on four or five occasions after my continual efforts to get him to do otherwise, said, "You may say nothing. I don't want you to tell them anything."

To support his claim of ineffective assistance of counsel, Singleton presented the testimony of Tom Carpenter, a Little Rock, Arkansas, attorney, as an expert witness at the habeas corpus hearing. Attorney Carpenter, who had defended a substantial number of capital cases that had reached the penalty phase of trial, testified as follows regarding Singleton's instructions to Wellenberger that he did not want Wellenberger to put in any evidence at the penalty phase of the trial:

In all the death cases in which I have been involved or which I have counseled, I have never met a defendant yet that did not at some point in the trial tell me that "If they find me guilty, let them burn me. That's it. I don't want you to do anything."

It's a very, very common response and from my association with attorneys in other states, I find that it's very common that, you know, if they get to that point, "That's the end of it. I don't want any evidence put on."

Carpenter acknowledged that in his opinion Wellenberger had rendered effective assistance during the guilt phase of the trial:

I think Mr. Wellengberg [sic] was very effective at the guilt phase. He filed a number of pretrial motions. He succeeded in getting certain evidence suppressed. I did not see anything he did improper in the guilt phase at all.

In its initial decision in this case, the district court made the following findings:

The Court credits the testimony of Mr. Wellenberger that he was concerned with and worked on the penalty phase from the time of his first conference with Mr. Singleton on June 14. He began preparation for that phase of the trial on June 14. He explained the penalty phase to Mr. Singleton long before the trial and also at the trial. He requested Mr. Singleton to provide him with a personal history and the names of persons who could provide mitigating evidence. And the Court accepts Mr. Wellenberger's testimony that he in fact subpoenaed a witness to testify at the penalty phase and had also planned to use Singleton and/or his mother. The Court is further convinced, and so finds, that Mr. Singleton alone made the decision not to put on any evidence even though this was against the direct and specific advice of Mr. Wellenberger. And Mr. Singleton was adamant in regard to this decision.
653 F.Supp. at 1118.

In its July 12, 1990, order entered following our remand in *Singleton I,* the district court made the following findings:

That there be no doubt, the Court finds from the evidence that petitioner understood the consequences of his choice and that he made it knowingly and intelligently. There is no plausible suggestion of mental disability such as would have prevented petitioner from understanding the consequences of what he was doing. The record at the hearing establishes that those consequences were explained and that petitioner made an informed choice. *See* Transcript of 9–17–84 Hearing, at 169–193; 391–6; 398–403. A concise summary of the situation is provided by Mr. Wellenberger's testimony at page 189 of the September 17 Transcript:

I tried to explain to Mr. Singleton to the best of my abilities what his options were, what he could prove, what evidence could be introduced which would be beneficial to him at this stage, the effects of the decision that the jury had to make and what we could do to make that a more favorable decision to him. And he consistently, throughout my representation, said that if it got to that he wanted to do nothing. He did not want to give them anything and let them do what they wanted to do.

Petitioner's contrary testimony is not credible.

*Singleton v. Lockhart,* No. 82–165 (E.D.Ark. July 12, 1990) (order at p. 6).

The district court then turned to Singleton's argument that the Constitution does not allow a defendant to override his attorney's judgment about what evidence to offer at the penalty phase of a trial in which the state is seeking the death penalty. The district court concluded that to accept Singleton's contention and to hold that Wellenberger was guilty of ineffective assistance of counsel by failing to override Singleton's express, adamant directions that he not submit any mitigating evidence would constitute a new rule of law that could not retroactively be applied to Singleton's case in view of the holdings of the United States Supreme Court in *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990); *Butler v. McKellar*, 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990); *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); and *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Concluding that this new rule, as the district court envisioned it to be, would not fall within either of the two exceptions set forth in those decisions, the district court concluded that it was without authority to recognize such a rule.

### III.

We will not overturn a district court's factual findings unless they are clearly erroneous, and we will accord deference to a district court's credibility determinations. Fed.R.Civ.P. 52(a); *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Having carefully reviewed the record, we conclude that the district court's finding that Singleton had knowingly and intelligently waived his right to present mitigating evidence, after having been fully and completely advised of his right to present such evidence, is not clearly erroneous and is amply supported by the evidence.

In contrast to the situation that existed in *Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991), Wellenberger was no unprepared tyro. He had had experience in handling murder cases prior to Singleton's trial, including cases involving interracial victims/defendants. In view of his excellent performance during the guilt phase, as attested to by Singleton's own expert witness, the record would not support a finding that Wellenberger was unprepared for the penalty phase of the trial. Likewise, the record would not support a finding that Wellenberger did not advise Singleton fully and completely of the right to present mitigating evidence and the dire consequences of the failure to present such evidence at that phase of the trial. The district court rightly credited Wellenberger's testimony that he had advised Singleton of this on at least three occasions.

The district court found Singleton's testimony to be not credible—and for good reason. Singleton's testimony at the habeas corpus hearing was at odds with everything he had earlier told Wellenberger in preparation for and during the course of the trial. Singleton's IQ, although not of the first rank, is certainly adequate to support a finding of an intelligent, knowing waiver of understood rights. His persistence in testifying that Wellenberger had asked him whether he would plead guilty in return for a twenty-one-year sentence is incredible in view of the state's insistence, as recounted in Wellenberger's testimony, upon seeking the death penalty.

Although Singleton now proclaims his lack of awareness and understanding, the record of his examination at the Arkansas State Hospital belie his claim. The examining doctors reported a hostile, resentful individual, who, when it suited him, could be pleasant and cooperative. The picture that emerges is that of an individual, who, as the diagnostic summary reports, was hostile and resentful and who manifested an "antisocial personality, severe," hardly the characteristics of one who was out of touch with reality or who was unaware of the consequences of his decision to waive his rights.

The question that remains is whether Wellenberger should have overridden Singleton's knowing, intelligent waiver of his right to present mitigating evidence. We need not grapple, as did the district

court, with the question whether such a holding would constitute a new rule of law as defined by *Teague v. Lane* and its progeny, for we hold that in the face of Singleton's knowing, intelligent waiver, Wellenberger was under no duty to do otherwise than he did.

In *Hayes v. Lockhart*, 852 F.2d 339 (8th Cir.1988), *vacated on other grounds*, 491 U.S. 902, 109 S.Ct. 3181, 105 L.Ed.2d 691 (1989), we stated that defense counsel should not have been faulted for honoring the defendant's desire that his sister not be called to testify during the penalty phase of the trial. *Id.* at 348. In *Smith v. Armontrout*, 812 F.2d 1050 (8th Cir.), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987), we held that in the light of the Supreme Court's holdings in *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), and *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976), it is possible for a defendant to make a competent waiver of the right to pursue further appellate relief from a sentence of death.[4] Other circuits have recognized that such a competent waiver is possible. *See Lenhard v. Wolff*, 603 F.2d 91 (9th Cir.1979); *Hays v. Murphy*, 663 F.2d 1004 (10th Cir.1981); *Autry v. McKaskle*, 727 F.2d 358 (5th Cir.), *cert. denied*, 465 U.S. 1085, 104 S.Ct. 1458, 79 L.Ed.2d 906 (1984); *Rumbaugh v. Procunier*, 753 F.2d 395 (5th Cir.), *cert. denied*, 473 U.S. 919, 105 S.Ct. 3544, 87 L.Ed.2d 668 (1985); *Felde v. Blackburn*, 795 F.2d 400 (5th Cir. 1986), *cert. denied*, 484 U.S. 873, 108 S.Ct. 210, 98 L.Ed.2d 161 (1987). *See also Foster v. Strickland*, 707 F.2d 1339, 1343 (11th Cir.1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984).

If a defendant may be found competent to waive the right of appellate review of a death sentence, we see no reason why a defendant may not also be found competent to waive the right to present mitigating evidence that might forestall the imposition of such a sentence in the first instance. As Wellenberger's testimony indicates, Singleton stated that he had experienced prison life and that if it came down to a choice between life in prison without parole or death, he would prefer to accept the death penalty.

As the district court found, there is no question but that Singleton was not laboring under any mental disability that would call into question his competence to knowingly and intelligently waive his right to present mitigating evidence. Thus, the *Rees v. Peyton* standard of competence has been satisfied. *See Smith v. Armontrout*, 812 F.2d at 1057. Accordingly, we hold that Singleton's waiver of his right to present mitigating evidence forecloses his challenge to his death sentence.

Notwithstanding our holding, we must voice our deep concern over the manner in which the state proceeded at the penalty phase of this trial. We simply cannot understand the prosecutor's stubborn refusal to agree to more than an in-place five-to-ten minute recess while Wellenberger conferred with Singleton. However senseless and cruel the killing for which a defendant is being tried, the state has the obligation of ensuring that the forms, as well as the realities, of justice be observed. Likewise, it is inexplicable to us why the trial judge, having agreed to the prosecutor's insistence upon a truncated recess, did not take at least another five or ten minutes to conduct an on-the-record colloquy with Singleton to ensure that the trial record reflected Singleton's knowing, intelligent waiver of his right to introduce mitigating evidence. Indeed, had Wellenberger not dictated his statement to the record immediately after the jury retired to deliberate, there would have been no contemporaneously-made record of what occurred during the short recess. Although the district court properly credited Wellenberger's testimony at the habeas hearing, conducted some five years after the trial, a contemporaneous on-the-record inquiry would have all but foreclosed the post-trial attack that

---

**4.** In *Whitmore v. Arkansas*, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990), and in *Demosthenes v. Baal*, 495 U.S. 731, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990), the Supreme Court again recognized the right of a mentally competent defendant to forego further challenges to a sentence of death.

Singleton levied on his decision to waive his rights. *Cf. Blystone v. Pennsylvania,* 494 U.S. 299, 306 n. 4, 110 S.Ct. 1078, 1083 n. 4, 108 L.Ed.2d 255 (1990). Were the record established at the 1984 habeas corpus hearing not so clear and the district court's findings that Singleton had knowingly and intelligently waived his right to present mitigating evidence not so strongly supported, our decision to affirm the denial of habeas relief might very well have been different. As it is, however, we conclude that the district court's findings are not only not clearly erroneous, they find strong support in the record. Accordingly, we hold that Singleton's challenge to his death sentence must be rejected.

## IV.

Singleton next argues that the Arkansas death penalty statute, Ark.Code Ann. 5–4–603(a), is unconstitutional because of its mandatory language that the jury "shall impose a sentence of death" if it finds beyond a reasonable doubt that aggravating circumstances exist and that they outweigh all mitigating circumstances found to exist.

The district court determined that Singleton's argument was foreclosed by recent Supreme Court decisions. *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); *Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). In both *Blystone* and *Boyde,* the Supreme Court upheld death penalty statutes that are much less favorable to a defendant than the Arkansas statute at issue. We therefore agree with the district court's determination that the Arkansas death penalty statute does not violate the Eighth Amendment. Likewise, we conclude that the statute as applied did not violate Singleton's right to due process.

The order denying the petition for writ of habeas corpus is affirmed.